United States District Court
Southern District of Texas
**ENTERED**
October 01, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| J. PAUL GILLIAM, a/k/a PAUL J. GILLIAM, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-24-0168 |
| | § | |
| C. SPENCER, *et al*., | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a motion for summary judgment filed by Defendants Deer Park Police Department officers Caleb Spencer (Spencer), Brandon Williams (Williams), Chase R. Erickson (Erickson), and Miranda L. Hudson (Hudson) in this *pro se* civil lawsuit (ECF No. 35) and Plaintiff J. Paul Gilliam's response in opposition (ECF No. 42).

Having considered the motion, the response, the exhibits, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons shown below.

## I. BACKGROUND AND CLAIMS

Plaintiff, a fifty-one-year-old resident of Deer Park, Harris County, Texas, filed a *pro se* amended complaint (ECF No. 21) under 42 U.S.C. § 1983 against Deer Park Police Department officers Spencer, Williams, Erickson, and Hudson in their individual capacities.[1]

[1]Plaintiff listed three additional defendants in his amended complaint: "Delamorena," "Garza," and "Sgt. Travis Trotti." He did not provide full names for the first two individuals and provided no service addresses or USM-285 forms for any of them. The additional defendants

In the amended complaint, Plaintiff alleges that on Thanksgiving Day, November 23, 2023, the Deer Park Police Department was notified that "an individual was yelling at the top of his lungs at the school [located across from Plaintiff's house] without a shirt on[.]" He alleges that Defendants arrived at the school location and "stomp[ed] [him] in the ground pulling [his] arms out of the ground and pushing [his] body down further in the ground," then pepper sprayed him in the eyes. He claims that the officers "pulled [his] arms and tore them apart" and that "it went on for over a minute." The officers then arrested him and transported him to jail. Plaintiff was charged with interfering with a police officer's public duties as to Officer Spencer, a misdemeanor offense. *State v. Gilliam*, Cause No. 248549201010 in Harris County Criminal Court at Law No. 15.

Plaintiff contends that he was violating no laws and that Defendants had no reasonable suspicion or probable cause to use force against him or to place him under arrest. He states that the criminal charges were later dismissed upon the State's motion. Plaintiff raises claims against Defendants for false arrest and use of excessive force as to the events of November 23, 2023. He seeks no specific relief in the amended complaint.

In their pending motion for summary judgment, Defendants claim entitlement to qualified immunity. Plaintiff opposes the motion and argues that Defendants are not entitled to qualified immunity because they acted without probable cause and used excessive force.

## II. LEGAL STANDARDS

---

have not been served, have not made an appearance, and are not parties before the Court in this lawsuit.

A. Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure ("FRCP") requires a court to enter summary judgment when the movant establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law." *Sulzer Carbomedics Inc. v. Oregon Cardio-Devices Inc.*, 257 F.3d 449, 456 (5th Cir. 2001). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R Tres Arboles L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013).

Summary judgment proceedings do not involve weighing the evidence or determining the truth of the matter. The court's task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020). Disputed factual issues must be resolved in favor of the nonmoving party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

A plaintiff's own statements may be sufficient to demonstrate a genuine issue of material fact. *Bourne v. Gunnels*, 921 F.3d 484, 492–93 (5th Cir. 2019). However, the nonmovant cannot avoid summary judgment by presenting "conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *Jones v. Lowndes County*, 678 F.3d 344, 348 (5th Cir. 2012) (cleaned up). Rather, "self-serving affidavits and declarations, like all summary judgment evidence, must

be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021) (cleaned up).

FRCP 56 does not impose upon a court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. Evidence not referred to in the response to the motion for summary judgment is not properly before the court, even if it exists in the summary judgment record. *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 217 & n.9 (5th Cir. 2016); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

Plaintiff and Defendants rely on video recordings as summary judgment evidence. In a summary judgment proceeding, a court must generally view the facts in the nonmovant's favor. But "where there is video capturing the events in question and opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Valencia v. Davis*, 836 F. App'x 292, 296 (5th Cir. 2020) (cleaned up). *See also Scott v. Harris*, 550 U.S. 372, 380, (2007); *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019) (rejecting plaintiff's version of facts as "blatantly contradicted and utterly discredited by video recordings").

B. <u>Qualified Immunity</u>

Defendants claim entitlement to the defense of qualified immunity. "Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam); *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023) ("The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal."). Qualified immunity shields government officials from civil liability when their conduct is objectively reasonable in light of clearly established law. *Crostley v. Lamar County*, 717 F.3d 410, 422 (5th Cir. 2013).

Once an officer pleads qualified immunity, the plaintiff has the burden to establish that the officer violated the plaintiff's clearly established federal rights. *Cass*, 814 F.3d at 728. "This is a demanding standard." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). Because qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law, we do not deny its protection unless existing precedent places the constitutional question beyond debate." *Argueta*, 86 F.4th at 1088 (cleaned up).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Once an official raises the defense, the burden shifts to the plaintiff to show a genuine dispute of material fact as to whether the official violated clearly established law. *Id.* To overcome qualified immunity, a plaintiff must show that (1) the official violated a statutory or constitutional right and (2) the right was

so "clearly established" at the time of the challenged conduct that a reasonable officer would be on notice that their conduct was against the law. *Ramirez v. Killian*, 113 F.4th 415, 421 (5th Cir. 2024). A police officer may rely on the statements of other officers and is entitled to qualified immunity if it was "reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." *Deville v. Marcantel*, 567 F.3d 156, 166 (5th Cir. 2009). Courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

If a defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were objectively reasonable in light of law which was clearly established at the time of the disputed action. *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

A plaintiff cannot satisfy his burden of proof in a summary judgment proceeding "with conclusory allegations or unsubstantiated assertions of wrongdoing." *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018); *Williams-Boldware v. Denton County*, 741 F.3d 635, 643–44 (5th Cir. 2014). Instead, a plaintiff "must point to specific evidence in the record demonstrating a material fact issue concerning each element of his claim." *Mitchell*, 895 F.3d at 370.

C. False Arrest

Plaintiff raises claims against Defendants in their individual capacities for false arrest as to the events of November 23, 2023.

A constitutional claim for false arrest requires a showing that there was no probable cause to arrest the plaintiff and, if none, whether probable cause was at least "arguable." *Davidson v. City of Stafford*, 848 F.3d 384, 391–92 (5th Cir. 2017); *see also Knighton v. Benton County*, 186 F.4th 310, 326 (5th Cir. 2026). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Knighton*, at 326. "Probable cause is an objective standard, [and] an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *D.C. v. Wesby*, 583 U.S. 48, 54 n.2 (2018).

D. Use of Excessive Force

Plaintiff also claims that Defendants violated his Fourth Amendment rights by using excessive force against him in effecting his arrest. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) (holding that claims for excessive force arise under the Fourth Amendment).

A plaintiff bringing an excessive force claim "must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Garza*, 943 F.3d at 744. The inquiries

into whether a use of force was "clearly excessive" or "clearly unreasonable" can be factually intertwined. *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on the facts and circumstances of each particular case." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. The "inquiry into the reasonableness of police force requires analyzing the totality of the circumstances." *Barnes v. Felix*, 605 U.S. 73, 80–82 (2025). Factors to consider include (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest. *Graham*, at 396.

"[O]vercoming qualified immunity is especially difficult in excessive-force cases." *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019). This "is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

## III. SUMMARY JUDGMENT EVIDENCE – VIDEO RECORDINGS

Plaintiff and Defendants rely on video recordings as summary judgment evidence. The video recordings are from the same sources and are apparently the same recordings: non-audio videotapes taken by security cameras at the Dabbs Elementary School on November 23, 2023 (ECF No. 35, Exhibit 12); self-recordings made by Plaintiff on his cell phone at the Dabbs Elementary School on November 23, 2023, and posted to his personal Facebook page (ECF No. 35, Exhibit 11); video recordings from patrol car dash cameras with partial audio (ECF No. 35, Exhibits 7, 8, 9, 15); and a video recording from the patrol car backseat of Plaintiff's transport to Deer Park Jail following his arrest (ECF No. 35, Exhibit 10). Defendants state in the motion for summary judgment that the Deer Park Police Department utilizes body microphones for police officers but not body cameras. (ECF No. 35, p. 16 n.7.) Although Plaintiff states that he submitted his own copies of the video recordings on a flash drive device (ECF No. 43), the Court reviewed the device and found it did not contain any retrievable information. Defendants submitted copies of the recordings on their own flash drive device (ECF No. 38) and in dropbox format at the hypertext link appearing in their motion for summary judgment (ECF No. 35, p. 11).

The Court has carefully reviewed each recording as relied upon by the parties and summarizes each recording as follows.

A. Security cameras at the Dabbs Elementary School (Defendants' Exhibit 12):

1. Front Driveway Exit Camera: Plaintiff, shirtless, is walking down a sidewalk on school property away from the camera. He turns to the

camera and begins gesticulating with his hands and arms, holding his cell phone and throwing punches at the camera while walking backwards. (2:16–23.) Although there is no audio, he appears agitated and is clearly yelling at the camera. He sits down on the concrete sidewalk facing away from the camera. (2:43.) He continues gesticulating, rocking back and forth while holding his cell phone and throwing his arms out with punching motions. He appears to be yelling at his cell phone. (3:00–5:32.) He gets up and walks off camera. (5:35.) A number of patrol cars and police officers are shown arriving and departing.

2. Front Parking Lot Camera: Plaintiff and his dog are walking up and down a sidewalk alongside the school. (9:03–11:25.) Plaintiff is shirtless, holding his cell phone out in front. Although there is no audio, he is clearly talking to his cell phone. He eventually walks out of camera range. A number of parol cars and police officers are shown arriving and departing.

3. Lambuth East Parking Camera: Plaintiff, shirtless, is walking across a street to the school campus. (1:20.) He is holding his cell phone out in front and looking at it. (1:42–1:50.) As he approaches closer to the security camera, he can be seen talking at his cell phone. (1:51–2:00.) He yells at the camera and throws punches with his arms in an agitated manner, and continues walking. (2:15.) He returns to the security camera and makes multiple obscene gestures at the camera, extending both of his middle fingers at the camera for several seconds (8:26–8:32). He is seen gesticulating and yelling at his cell phone, crouching and bobbing up and down in an agitated manner (13:05–13:19). He drops down to the sidewalk and lies back on the concrete, continuing to look at his cell phone until he eventually sits back up (13:20–14:00). When his phone display briefly appears in view, it shows his face. (14:13; 16:45.) He continues sitting on the concrete sidewalk viewing or recording himself for several minutes until he stands up and continues walking (17:11). He grabs his dog by the collar of its harness and drags/carries him away (17:13), looking over his shoulder behind him until two police officers are seen walking towards him (17:33). Plaintiff stops, faces the officers and can be seen yelling at them. When a third police officer appears walking towards Plaintiff from the opposite direction, Plaintiff again picks his dog up by the harness collar and quickly walks away. (17:53.) The officers continue approaching Plaintiff, at which point he stops and the officers stop their approach. (18:17.) Although the activities take place at a distance, the officers appear calm and converse with Plaintiff for several minutes without further approach. Plaintiff sits down on the sidewalk holding his dog

(20:52). Plaintiff and the officers continue conversing without any change in their positions. Three additional police officers arrive on scene and begin walking towards the other officers (22:23), at which point Plaintiff stands back up (22:36) but does not walk away. Plaintiff's father arrives on the scene in a silver truck and pulls up next to Plaintiff and the officers. (23:05.) The officers and Plaintiff begin moving towards the truck and there is no physical contact with Plaintiff. (23:21.) Plaintiff begins putting his dog into the truck, at which point Plaintiff can no longer be seen and the officers quickly converge on the truck. (23:38.) At least one officer can be seen pulling Plaintiff back out of the truck, and Plaintiff falls to the grass-covered ground. (23:45.) At least two officers can be seen on the ground with Plaintiff, and Plaintiff's father can be seen standing next to his truck watching the events without interfering. Plaintiff, in handcuffs, is helped up from the ground (26:17) and placed inside a nearby police vehicle (26:25). The police vehicle transporting Plaintiff exits the school campus grounds (28:31) and at least one officer remains behind speaking with Plaintiff's father (28:40–29:33). Plaintiff's father gets into his truck and drives away (42:30).

4. North East Exit – South East Parking Camera: Plaintiff, shirtless, is walking through the school parking lot with his cell phone held out in front of him (6:51). He drops into a semi-crouch three times while talking to his phone (7:08–7:11) and continues walking back and forth across the parking lot. At one point he bends forward and yells in an agitated manner, throwing punches with his phone, and trips over a curb (8:01–8:08). He walks up to the school building and looks up at a wall, yelling and throwing his arms until he walks out of camera range while carrying/pulling his dog by the harness.

B. Plaintiff's Facebook Cell Phone Videos (Defendants' Exhibit 11):

1. Recording No. 1 (21 seconds; 3:09 p.m.): The recording shows Plaintiff's face and upper bare torso with the Dabbs Elementary School building behind him. Plaintiff is yelling into his cell phone in an incoherent manner about "fucking cops" and "not giving a rat's fucking ass fuck" about going to jail. He starts screaming in an increasingly louder and more agitated voice, "I got you bitch ass motherfuckers, I fucking got you, you big ass fucking mother fuckers, I've fucking got you, you big ass motherfuckers, I got you, you big ass motherfuckers, I got you big. . ." until the recording ends. Sweat can be seen running down the side of his neck, and he is drooling and wiping his face with his hands throughout the recording.

2. Recording No. 2 (21 seconds; 3:10 p.m.): The recording shows Plaintiff's face and upper bare torso with the Dabbs Elementary School building in the background. He speaks rapidly and slurs his words, saying "You would never in a million years expect to get no motherfucking news like that on Thanksgiving, huh?" He continues talking, but his words are incoherent. Plaintiff is sweating, drooling, and wiping his eyes, nose, and mouth. Grayish-white foam can be seen collecting along the sides of his mouth, which he wipes away.

3. Recording No. 3 (21 seconds; 3:11 p.m.): The recording shows Plaintiff's face and upper bare torso with the Dabbs Elementary School building in the background. He speaks semi-coherently, saying in a progressively louder and faster voice, "I fucking told you [unintelligible] sorry no good motherfuckers I was gonna get you fucking asses. Yall've done nothing but make me crazy for the past three goddamn fucking years. Made me fucking nuts. I was already crazy as it was. And I got you bitches I finally got you motherfuckers I finally got you fucking bitches oh yeah it's a fucking good motherfucking day today." Plaintiff is agitated and sweating.

4. Recording No. 4 (21 seconds, 3:11 p.m.): The recording shows Plaintiff's face and upper bare torso with the Dabbs Elementary School building in the background. The recording starts with Plaintiff screaming into his phone, extremely agitated and gesturing with his hand, yelling "Fuck you bitch ass [unintelligible] I told you motherfuckers I'm gonna kick your fucking asses and I got you fucking bitches. Fuck you." Plaintiff then lowers his voice, bares his teeth for several seconds, speaks incoherently, then screams "You're the fucking [unintelligible] fuck you bitch ass [unintelligible] I told you motherfuckers." Plaintiff is sweating, drooling, wiping his nose and face, with grayish-white foam visible around the corner of his mouth.

5. Recording No. 5 (21 seconds, 3:19 p.m.): The recording shows Plaintiff's face and upper bare torso with the Dabbs Elementary School building in the background. The recording begins with Plaintiff grinning into his camera and speaking incoherently in a lower voice, saying "[unintelligible] from the heart don't let it go to your head get a big head my head's about the size of as this goddamn elementary school out here. So okay you'll offer me what again what was that you were trying to [unintelligible] me again?" Plaintiff begins laughing, "What was that sir? I couldn't hear." No other person appears on the recording and there is no actual conversation. Plaintiff

is sweating, drooling, wiping his face and nose, and showing grayish-white foam around the corner of his mouth.

C. Patrol Car Dash Camera Videos (Exhibits 7–9, 15):[2]

1. Officer Williams Dash Camera Video (Defendants' Exhibit 7):

The patrol car is parked in the Dabbs Elementary School parking lot distant from where Plaintiff and three police officers are standing and talking. Plaintiff, who is next to the street and holding his dog, is talking loudly about being "arrested for being happy," and an officer tells him, "We're just trying to figure out what's going on." (0.45–0.50.) Plaintiff continually talks in an agitated manner and interrupts the officers, cursing and raising his voice. The video covers the arrival of Plaintiff's father, Plaintiff's attempt to get into his father's truck, his physical removal from the truck by the officers, his being taken to the ground and handcuffed by the officers, and his transport from the scene. The audio is largely unintelligible and the view is too far away to show the events in any detail.

2. Officer Delamorena Dash Camera Video (Defendants' Exhibit 8):

The patrol car is parked on the street closer to the events. Plaintiff and three officers are standing near a residential intersection on the school campus. Plaintiff is closest to the street, holding his dog as three other officers walk up. The audio is clearer but the exchanges between Plaintiff and the officers are drowned out by his dog's constant barking. Plaintiff is yelling at the officers as his father's truck pulls into the parking lot. His father exits the truck and stands calmly watching the events. Plaintiff walks to the truck with the officers and places the dog inside, but he himself then goes into the truck. (1:48–1:50.) He is ordered to get out, and the officers converge on the truck. Plaintiff states, "Why are you arresting me, motherfuckers?" and he is again ordered to get out of the truck. Plaintiff is pulled from the truck and taken to the ground on the nearby grass. (1:55–2:07.) An officer orders Plaintiff to give them his hand, and Plaintiff screams and curses at the officers. An officer warns Plaintiff that he'll be tazed, but no taser is deployed. (2:17.) Plaintiff

[2]For video recordings with alternate audio tracks, track four provided audio playback for the officers on scene and Plaintiff. The quality is poor due to overlapping voices, barking from Plaintiff's dog, and ambient noises. Most of the conversations and exchanges were not clear or understandable.

continues yelling, breathing heavily. The officers state, "Spray," and the sound of a burst of spray can be heard. (2:34–2:35.) Plaintiff begins loudly yelling, "Ah, ah, ah" and officers can be heard coughing. An officer tells the group that he has a cuff. (2:55.) Plaintiff begins repeatedly yelling "OK OK OK" (3:00–3:15) and says he can't breathe. (3:15.) The officers tell Plaintiff's father that they are taking Plaintiff to jail, and the father tells Plaintiff that he has his phone. (4:15.) Plaintiff's father says, "I have no idea what [unintelligible]," to which an officer responds, "Yeah, me neither." (4:21–4:22.) The officers help Plaintiff up and walk with him to a patrol car. Plaintiff walks quickly with the officers. As they place Plaintiff into the vehicle, Plaintiff yells, "Hey dad, call the cops." (4:45–4:46.) The officers roll down the back window for Plaintiff. Plaintiff's father tells one of the officers, "He's going to be a handful [unintelligible]," to which the officer responds, "He'll be, he'll be okay." (5:37–5:40.) The patrol car with Plaintiff drives away. Plaintiff's father asks an officer what he'll be charged with, and the officer responds, "I don't know yet [unintelligible], probably resisting arrest or interfering with the duties of a public servant at least." (6:34–6:41.)

3. <u>Sgt. Trotti Dash Camera Video (Defendants' Exhibit 9)</u>:

As the patrol car arrives at the scene, Plaintiff is on the ground surrounded by several officers. (1:58.) There is no audio linked to the scene. An officer removes an item from Plaintiff and hands it to Plaintiff's father who is standing nearby. Plaintiff, who is handcuffed, is helped to a sitting and standing position by the officers and they all walk out of camera range. (4:03.)

4. <u>Officer Hudson Dash Camera Video (Defendants' Exhibit 15)</u>:

The patrol car is parked behind two other patrol cars and has limited visual access to the scene. Plaintiff's dog can be heard continuously barking and the exchanges between Plaintiff and the officers are largely inaudible. Plaintiff can be heard yelling at the officers but his words are not discernable. He tries to get into his father's truck with his dog, but the officers physically pull him from the truck. He asks, "What are you doing? Why are you arresting me?" (1:46–1:51.) He is taken to the ground on the grass. Several officers tell him to give them his hands, and Plaintiff can be heard yelling. (2:00.) An officer says, "Spray" and coughing can be heard while Plaintiff yells, "ah ah ah" for several seconds. (2:29.) Plaintiff begins yelling, "OK OK OK" and is turned to his side and helped to a sitting position when he says "I can't breathe." (3:38–3:40.) An officer tells him that they will get him "decontaminate" and

get him cleaned up. (4:58–5:02.) Plaintiff is helped to a standing position and the officers walk with him to a patrol car and place him inside. An officer confirms that only one officer had used a spray and that nothing else had been used by the officers. (4:53–5:00.) An officer offers to call Plaintiff's father when they have more information.

D. Patrol Car Backseat Video Camera (Defendants' Exhibit 10):

The camera is focused on the empty backseat of a patrol car. Plaintiff and police officers can be heard outside of the vehicle. Plaintiff loudly and rapidly asks why they are holding him; the police respond that they are investigating and "just trying to figure out what's going on." Plaintiff's voice becomes louder and more agitated and he can be heard saying, "I'll put your ass in federal court." (0:30–1:25.) The officers remain calm and tell him to hold on to his dog. An officer asks Plaintiff if he has any narcotics, and Plaintiff responds in the negative. (2:54–2:57.) The officer asks Plaintiff why he is outside in the cold with no shirt on, but Plaintiff does not respond. (2:58–3:03.) An officer states that Plaintiff's father was contacted and is on his way to get the dog. (3:07–3:15) An officer says that the father's truck has pulled in and tells Plaintiff to stay where he is. (3:14–3:16.) Plaintiff and the officers continue talking, but the exchange is inaudible due to the dog's barking. (3:17–3:35.) Plaintiff can be heard asking several times in a loud voice, "What's next? What's gonna happen next? What're we gonna do next? What's next?" (3:37–3:47.) Plaintiff asks his father, "You watchin' this?" The father replies, "I want you to calm down." Plaintiff responds, "And I want *you* to get rid of them. He's not gonna take me to jail for just fuckin' nothing. I've done nothing wrong." An officer says, "Now J. Paul, no one's said anything about jail." The father replies, "You were disturbing the peace," to which Plaintiff says, "Whatta mean disturbing the peace. I was just shouting." The father says, "That's [unintelligible] the yelling. You were yelling." (3:57–4:16.) An officer states, "Stay right here." (4:14.) Plaintiff states, "What are you doing? What are you doing? Why you arresting me here?" while a female officer twice says, "Get out." (4:21–4:22.) Noises are heard, doors are slammed, the dog's barking intensifies. Plaintiff yells from a distance, "What the fuck you doing?" while officers are heard ordering, "Your hands. Hands. Show us your hands." (4:24–4:32.) Plaintiff can be hearing yelling "Motherfuckers" while another officer says, "I have a cuff. I got a cuff." (4:37–4:49.) An officer calmly says, "Hold on, sir. Hold on." (4:50–4:52.) Plaintiff continues loudly yelling. An officer states, "Pepper spray," and coughing is heard. (5:11–5:19.) Plaintiff repeatedly yells, "OK

> OK OK OK" for twelve seconds (5:21–5:37) then yells, "I can't breathe I can't breathe." (5:40–5:44.) He then repeatedly yells "ah ah ah" for over fifteen seconds. (5:45–6:02.) He again says, "I can't breathe," but is loudly breathing as he says it. (6:15–6:16.) Plaintiff is helped into the backseat of the patrol car. (7:10.) He continues breathing heavily and yelling "You motherfuckers" and "I can't breathe." (7:24–34.) He bangs his head into the window yelling "I can't breathe," and two officers open the back doors and look in. (7:35.) An officer rolls the back window down next to Plaintiff. Plaintiff continues breathing heavily and talking unintelligibly. Plaintiff and an officer tell each other "We're good" and the officer expresses his appreciation. (8:12–8:14.) The officer tells Plaintiff that they are going to run him down to the jail, meet with EMS, and clean up his face. The officer tells Plaintiff he needs to slow his breathing down, and Plaintiff agrees, saying "Keep talking to me." (8:40–9:00.) The transport to jail takes approximately three minutes, during which time sweat and/or drool can be seen dripping from Plaintiff's chin and neck and wind can be heard coming in through the open back window. The officer opens the back door upon their arrival, and Plaintiff says, "Yeah, I don't got a problem with ya'll I know ya'll better but there's a coupla ya'll nuh uh" as he shakes his head. (12:32–12:34.) He continues talking but his words are slurred and unintelligible. He shakes sweat from his face, wipes his face on his pants leg, breaths more slowly, and is no longer yelling. He continues cursing to himself and putting his head down until the recording ends. (13:48.)

## IV. SUMMARY JUDGMENT EVIDENCE – AFFIDAVITS

### A. Eyewitness Officer John Garza

Defendants submitted an affidavit of non-party eyewitness Deer Park Police Department Officer John Garza, who testifies as follows:

> My name is John Garza. I have personal knowledge of all of the facts stated in this declaration, and all such facts are true and correct.
>
> I am a patrol officer for the City of Deer Park. In that capacity, on November 23, 2023, at approximately 1515 hours [3:15 p.m.], I was dispatched to 302 E. Lambuth Dr., to backup Officers Williams and Spencer, regarding a suspicious person reported to be yelling and not wearing a shirt or shoes in front of an elementary school. Upon arriving, I observed a person already known to me as J. Paul Gilliam, on the northeast side of Dabbs Elementary School. I was

familiar with Mr. Gilliam from other encounters I previously had with him in my capacity as a police officer, as well as from the reputation he had among other officers in the Department who knew of his arrest record and/or who had personally participated in some of those arrests. I knew that Gilliam, by reputation, was a drug addict and had been arrested on several occasions in possession of such substances such as crack cocaine and synthetic marijuana. I further knew that he had a tendency to become belligerent and violent when intoxicated.

Gilliam appeared in a state of drug-induced delirium when I encountered him at this time. In addition to being shirtless and barefoot on a cold day,[3] which seemed odd, he was perspiring heavily, frothing at the mouth, and yelling incoherently and belligerently at the other officers on scene. Gilliam was also holding a gray, barking dog by its harness, as if it were a suitcase, and the other officers were telling him to control the dog. We continued to assess the situation and Gilliam's state of mind while talking to him to keep him from walking off.

Gilliam's father arrived at the scene to take the dog. When Gilliam was putting the dog in his father's truck, he attempted to get inside and close the door. Officers Spencer and Williams immediately grabbed Gilliam to stop him from getting in the truck. Gilliam attempted to pull away from them, but the two of them succeeded in pulling Gilliam clear of the truck. Once he was outside, Officer Erickson took him to the ground by a leg sweep. I then closed the passenger side door of the truck, then the driver's side door, to keep the dog from getting out.

Once on the ground, Gilliam continued to struggle by pulling his hands beneath his body and refusing to comply with repeated verbal commands by the officers to place his hands behind his back. Officer Williams pepper sprayed Gilliam with one short burst to gain compliance. It took the assistance of multiple officers to maintain control of Gilliam until he could be handcuffed.

Gilliam was placed in handcuffs behind the back and secured in the rear passenger-side seat of my patrol vehicle. I have reviewed the backseat video

---

[3]The video recordings all show that Plaintiff was wearing shoes throughout the incident. However, this discrepancy does not raise a genuine issue of material fact precluding the granting of summary judgment in this case.

> recording made by the in-car video camera of my vehicle, which I understand will be submitted as **Exhibit 10** to a motion for summary judgment in the above entitled case, and that video accurately reflects the event depicted. After Gilliam was secured in the back seat, I transported him to the Deer Park Jail directly, where medics were on standby to clean the pepper spray from his eyes and face, which they did.

(ECF No. 35-5, pp. 1–2, original boldface.)

B. Defendant Officer Caleb Spencer

Officer Spencer submitted an affidavit in support of summary judgment wherein he testifies as follows:

> My name is Caleb Spencer, a defendant in the above cause. I have personal knowledge of all of the facts stated in this declaration, and all such facts are true and correct.
>
> I am a patrol officer for the City of Deer Park. In that capacity, on November 23, 2023, at approximately 1514 hours [3:14 p.m.], Officer Brandon Williams and I received a call from the 9-1-1 dispatcher reporting that a concerned citizen had called to report a white, reportedly bare-chested, male "screaming at the top of his lungs at no one." The location of this reported disturbance was in the parking lot at 302 E. Lambuth Dr., which is the location of Dabbs Elementary School, a public school located within the city limits of Deer Park, Texas.
>
> Officer Williams and I arrived at the elementary school in the same vehicle. I have reviewed the school security video which my lawyer in this case will attach as **Exhibit 12** to the motion for summary judgment filed on my behalf.
>
> Upon arrival at the school location, I first observed a white male matching the description given by the 9-1-1 dispatcher sitting on the ground in the parking lot on the northeast side of the building. I immediately recognized the person to be J. Paul Gilliam, the plaintiff in this case. Gilliam was in the company of a medium-sized dog running off leash on the public property.
>
> I was already familiar with Gilliam from other encounters I have had with him in my capacity as a police officer, as well as from the reputation he has among

other officers in the Department who know of his arrest record or had personally participated in some of those arrests. By reputation, Gilliam is a drug addict who has been previously arrested by Deer Park police officers and found in possession of illegal narcotics on several of those occasions. By reputation, Gilliam regularly used a substance known as synthetic marijuana, or by its street name, "kush." I further knew of Gilliam's reputation for belligerence and potential violence when he was intoxicated.

Officer Williams and I exited our vehicles and together approached Gilliam on foot. When we made initial verbal contact with Gilliam, he started walking northeast away from us. We commanded him to stop walking. Our intent was to detain him to determine whether he was intoxicated, and whether his loud, incoherent screaming was due to some mental health emergency, or otherwise to order him to desist from disorderly conduct (making unreasonable noise in a public place) prohibited by Section 42.01(a)(5) of the Penal Code. But rather than comply with our order to stop, he continued walking away, yelling at us loudly, in a hostile tone: "Stay right where you are!" and "Don't come any closer!"

Officer Williams and I continued to follow Gilliam, calling on him to stop, but he continued to walk away. Eventually he did stop just north of the parking lot, as depicted in the school security video, when his line of retreat was cut off by Deer Park Officer John Garza, whose vehicle can be seen in the school security video arriving and parking to Gilliam's north.

As I drew closer to Gilliam on foot, I observed white foam around the corner of his mouth. He also exhibited slurred, rapid, and incoherent speech, as well as a chemical odor emanating from his breath/body, which indicated the presence of synthetic marijuana or "kush." Another factor indicating intoxication was that he was sweating profusely, despite cool temperatures in mid-50s Fahrenheit, and being shirtless. Coupled with his reputation for addictive stimulant abuse, I believed Gilliam was experiencing a symptom known as excited delirium, a byproduct of stimulant use. His apparent state of likely intoxication and his known propensity for violent behavior also caused me to believe him to be a possible danger to others or himself. Accordingly, I believed there was probable cause to arrest him for public intoxication.

After the arrest, Lt. Hill of the Deer Park Police Department downloaded video recordings from Gilliam's public Facebook page, that Gilliam had been

recording on that same date, shortly before our encounter with him. I understand these video clips will be filed as **Exhibit 11** to the motion for summary judgment filed on my behalf. I have reviewed these clips, and the clips accurately depict Gilliam's general demeanor at the time I encountered him: yelling, jabbering incoherently, sweating, dilated pupils, and white froth forming at the corners of his mouth. Based on my training and experience, I knew all of these symptoms were indicative of stimulant intoxication.

At the request of officers at the scene, the City of Deer Park dispatcher contacted Gilliam's father, who lives nearby, to come to the scene to take custody of the dog. Before Gilliam's father arrived, other officers who had been dispatched to the scene began to arrive. Normally, only two officers would be called to a disturbance of this nature; however, because of Gilliam's reputation for violent behavior while intoxicated, more officers were dispatched.

I have reviewed the following video recordings which I understand will be submitted as exhibits to the motion for summary judgment filed on my behalf: Dash Cam Video of Officer Brandon Williams as **Exhibit 7**; Dash Cam Video of Officer Miranda Delamorena as **Exhibit 8**; Dash Cam Video of Sgt. Travis Trotti as **Exhibit 9**; Backseat Cam of Officer John Garza as **Exhibit 10**; and Dash Cam Video of Miranda Hudson as **Exhibit 15**. Each of these recordings fairly depict what the videos show; however, as all of the videos were made from car dash cameras, the views are distant. The sound tracks – which were recorded from body microphones on each of the officers – are mostly poor quality and muffled to the point of inaudibility in many places, so no clear recording of all speakers and statements are present.

During the few minutes we awaited the arrival of Gilliam's father, officers told Gilliam he was not allowed to leave, because he was being detained for investigation into his apparent state of intoxication. Some of these statements can be faintly heard on the audio-recording made by the backseat recorder of Officer Garza's vehicle (at time-counter 0:52–1:06, 1:25–35). He was told that he would need to give the dog to his father. Gilliam resumed yelling belligerently at the officers, telling them, "You're not taking me to jail" (3:50–55); and uttering threats such as "I'll kick your ass so goddamn fast" (1:19–25), and a vague threat that if we touched him we were going to die.

Gilliam's father arrived in a silver colored truck. This scene is visible on some of the dash cameras videos submitted in support of the motion for summary

> judgment – Williams Dash Video (3:12); Delamorena Dash Video (0:49); Hudson Dash Video (1:02). Gilliam was told to give the dog to his father and that he was not permitted to leave or get inside of the truck. However, as Gilliam placed the dog inside of the cab of the truck, he quickly slipped inside of the cab behind the dog, as one of the officers commanded him to, "Stay right there!" Garza Backseat Video (4:19–20); Hudson Video (1:40).
>
> Once inside and onto the passenger seat, Gilliam attempted to close the passenger door, which some of the officers prevented him from doing, commanding him to "Get out!" and "Step out!" Garza Backseat Video (4:19–20); Delamorena Video (1:48–2:00); Hudson Video (1:48–50). Officers then grabbed Gilliam and pulled him out of the truck. As they did, he attempted to pull away from them. Officer Erickson then successfully performed a leg sweep on Gilliam to take him to the ground.
>
> On the ground, officers tried to apply handcuffs on Gilliam, commanding him repeatedly to "Give me your hands," and "Give us your hands." Williams Dash Video (4:30–38); Hudson (1:58–2:05); Delamorena (2:05–11); Garza Backseat (4:30–43). Initially, Gilliam refused to place his hands behind his back but instead kicked his feet and pulled his hands away from the officers. As the struggle to get him handcuffed ensued, he was initially warned that he would be tazed, then warned of pepper spray, if he continued to resist. Williams Dash Video (4:23–45); Husdon [*sic*] (2:14). Officer Williams then deployed a one-second burst of pepper spray (OC spray) to Gilliam's eyes and forehead. After the OC spray was deployed, Gilliam complied with officers' commands to put his hands behind his back. He was then secured in handcuffs and placed in the rear of Officer Garza's marked patrol car.

(ECF No. 35-1, pp. 1–4, original boldface.)

C. <u>Defendant Officer Chase R. Erickson</u>

In his affidavit submitted in support of the motion for summary judgment, Officer Erickson testifies as follows:

> My name is Chase R. Erickson, a defendant in this case. I have personal knowledge of all of the facts stated in this declaration, and all such facts are true and correct.

> I am a patrol officer for the City of Deer Park. On November 23, 2023, at approximately 1513 hours [3:13 p.m.], I was dispatched as a secondary unit to assist Officers Williams and Spencer on call for services at 301 E. Lambuth Ln. Upon arrival, I made contact with J. Paul Gilliam, whom I knew by name and appearance, in the parking lot of Dabbs Elementary School. I was already familiar with Gilliam from other encounters I previously had with him in my capacity as a police officer, as well as from the reputation he had among other officers in the Department who knew of his arrest record and/or who had personally participated in some of those arrests. I knew that Gilliam, by reputation, was a drug addict and had been arrested on several occasions in possession of illegal substances such as crack cocaine and synthetic marijuana (a/k/a "kush"). In addition to being shirtless and barefoot on a cold day, which seemed odd, he was perspiring heavily, frothing at the mouth, and yelling incoherently and belligerently at the other two officers. Based on my observations of Gilliam's anger and belligerence at the scene, coupled with his reputation, I believed that Gilliam had committed the offense of public intoxication. I also believed he could become violent and pose a risk of harm to other persons or to himself.
>
> Officers at the scene asked Gilliam to place his dog inside his father's vehicle, which was parked in the north parking lot of Dabbs Elementary. The officers did not tell Gilliam he was free to go or get inside the vehicle. In fact, he was expressly told he was not going anywhere and under investigation for public intoxication. However, while placing the dog inside the vehicle, Gilliam climbed inside and attempted to close the door shut behind himself. Officer Williams was able to catch the door before Gilliam could slam it shut. I grabbed Gilliam's right arm pulling him from the vehicle. He took a very aggressive squatting stance to prevent the officers from effecting the arrest. He balled up his fist while I grabbed his right arm. He began pulling his arms close to his chest, preventing me from gaining control of his right arm. I determined that Gilliam needed to be taken to the ground so the other officers and I could gain better control. I swept Gilliam's right leg with my foot, a maneuver which took him off balance and to the ground. I then sat on his right leg to prevent any further kicking. Officers repeatedly commanded Gilliam to give us his hands, which he refused to obey. Following a warning, Officer Williams deployed a short (approximately one second) burst of pepper spray to Gilliam's face. Gilliam submitted to the handcuffing and was then taken into custody without further incident.

(ECF No. 35-3, pp. 1–2.)

D. Defendant Officer Brandon Williams

Officer Williams submitted an affidavit in support of summary judgment, wherein he testifies as follows:

> My name is Brandon Williams, a defendant in the above cause. I have personal knowledge of all of the facts stated in this declaration, and all such facts are true and correct.
>
> I am a patrol officer for the City of Deer Park. In that capacity, on November 23, 2023, at approximately 1514 hours [3:14 p.m.], Officer Caleb Spencer and I received a call from the 9-1-1 dispatcher reporting that a concerned citizen had called to report a white, reportedly bare-chested, male "screaming at the top of his lungs at no one." The location of this reported disturbance was in the parking lot at 302 E. Lambuth Dr., which is the location of Dabbs Elementary School, a public school located within the city limits of Deer Park, Texas.
>
> Officer Spencer and I arrived at the elementary school in the same vehicle. I have reviewed the school security video which my lawyer in this case will attach as **Exhibit 12** to the motion for summary judgment filed on my behalf.
>
> Upon arrival at the school location, I first observed a white male matching the description given by the 9-1-1 dispatcher sitting on the ground in the parking lot on the northeast side of the building. I immediately recognized the person to be J. Paul Gilliam, the plaintiff in this case. Gilliam was in the company of a medium-sized dog running off leash on the public property.
>
> I was already familiar with Gilliam from other encounters I have had with him in my capacity as a police officer, as well as from the reputation he has among other officers in the Department who know of his arrest record or had personally participated in some of those arrests. By reputation, Gilliam is a drug addict who has been previously arrested by Deer Park police officers and found in possession of illegal narcotics on several of those occasions. By reputation, Gilliam regularly used a substance known as synthetic marijuana, or by its street name, "kush." I further knew of Gilliam's reputation for belligerence and potential violence when he was intoxicated.

Officer Spencer and I exited our vehicles and together approached Gilliam on foot. When Officer Spencer and I made initial verbal contact with Gilliam, he started walking northeast away from us. We commanded him to stop walking. Our intent was to detain him to determine whether he was intoxicated, and whether his loud, incoherent screaming was due to some mental health emergency, or otherwise to order him to desist from disorderly conduct (making unreasonable noise in a public place) prohibited by Section 42.01(a)(5) of the Penal Code. But rather than comply with our order to stop, he continued walking away, yelling at us loudly, in a hostile tone: "Stay right where you are!" and "Don't come any closer!"

Officer Spencer and I continued to follow Gilliam, calling on him to stop, but he continued to walk away. Eventually he did stop just north of the parking lot, as depicted in the school security video, when his line of retreat was cut off by Deer Park Officer John Garza, whose vehicle can be seen in the school security video arriving and parking to Gilliam's north.

As I drew closer to Gilliam on foot, I observed white foam around the corner of his mouth. He also exhibited slurred, rapid, and incoherent speech, as well as a chemical odor emanating from his breath/body, which indicated the presence of synthetic marijuana or "kush." Another factor indicating intoxication was that he was sweating profusely, despite cool temperatures in mid-50s Fahrenheit, and being shirtless. Coupled with his reputation for addictive stimulant abuse, I believed Gilliam was experiencing a symptom known as excited delirium, a byproduct of stimulant use. His apparent state of likely intoxication and his known propensity for violent behavior also caused me to believe him to be a possible danger to others or himself. Accordingly, I believed there was probable cause to arrest him for public intoxication.

After the arrest, Lt. Hill of the Deer Park Police Department downloaded video recordings from Gilliam's public Facebook page, that Gilliam had been recording on that same date, shortly before our encounter with him. I understand these video clips will be filed as **Exhibit 11** to the motion for summary judgment filed on my behalf. I have reviewed these clips, and the clips accurately depict Gilliam's general demeanor at the time I encountered him: yelling, jabbering incoherently, sweating, dilated pupils, and white froth forming at the corners of his mouth. Based on my training and experience, I knew all of these symptoms were indicative of stimulant intoxication.

At the request of officers at the scene, the City of Deer Park dispatcher contacted Gilliam's father, who lives nearby, to come to the scene to take custody of the dog. Before Gilliam's father arrived, other officers who had been dispatched to the scene began to arrive. Normally, only two officers would be called to a disturbance of this nature; however, because of Gilliam's reputation for violent behavior while intoxicated, more officers were dispatched.

I have reviewed the following video recordings which I understand will be submitted as exhibits to the motion for summary judgment filed on my behalf: my own (Williams) Dash Cam Video as **Exhibit 7**; Dash Cam Video of Officer Miranda Delamorena as **Exhibit 8**; Dash Cam Video of Sgt. Travis Trotti as **Exhibit 9**; Backseat Cam of Officer John Garza as **Exhibit 10**; and Dash Cam Video of Miranda Hudson as **Exhibit 15**. Each of these recordings fairly depict what the videos show; however, as all of the videos were made from car dash cameras, the views are distant. The sound tracks – which were recorded from body microphones on each of the officers – are mostly poor quality and muffled to the point of inaudibility in many places, so no clear recording of all speakers and statements are present.

During this few minutes we awaited the arrival of Gilliam's father, officers told Gilliam he was not allowed to leave, because he was being detained for investigation into his apparent state of intoxication. Some of these statements can be faintly heard on the audio-recording made by the backseat recorder of Officer Garza's vehicle (at time-counter 0:52–1:06, 1:25–35). He was told that he would need to give the dog to his father. Gilliam resumed yelling belligerently at the officers, telling them, "You're not taking me to jail" (3:50–55); and uttering threats such as "I'll kick your ass so goddamn fast" (1:19–25), and a vague threat that if we touched him we were going to die.

Gilliam's father arrived in a silver colored truck. This scene is visible on some of the dash cameras videos submitted in support of the motion for summary judgment – Williams Dash Video (3:12); Delamorena Dash Video (0:49); Hudson Dash Video (1:02). Gilliam was told to give the dog to his father and that he was not permitted to leave or get inside of the truck. However, as Gilliam placed the dog inside of the cab of the truck, he quickly slipped inside of the cab behind the dog, as one of the officers commanded him to, "Stay right there!" Garza Backseat Video (4:19–20); Hudson Video (1:40).

> Once inside and onto the passenger seat, Gilliam attempted to close the passenger door, which some of the officers prevented him from doing, commanding him to "Get out!" and "Step out!" Garza Backseat Video (4:19–20); Delamorena Video (1:48–2:00); Hudson Video (1:48–1:50). Officers then grabbed Gilliam and pulled him out of the truck. As they did, he attempted to pull away from them. Once outside, Officer Erickson then successfully performed a leg sweep on Gilliam to take him to the ground.
>
> On the ground, officers tried to apply handcuffs on Gilliam, commanding him repeatedly to "Give me your hands," and "Give us your hands." Williams Dash Video (4:30–38); Hudson (1:58–2:05); Delamorena (2:05–11); Garza Backseat (4:30–43). Initially, Gilliam refused to place his hands behind his back but instead kicked his feet and pulled his hands away from the officers. As the struggle to get him handcuffed ensued, he was initially warned he would be tazed, then warned of pepper spray, if he continued to resist. Williams Dash Video (4:23–45); Delamorena (2:18–37); Husdon [*sic*] (2:14). I deployed a one-second burst of pepper spray (OC spray) to Gilliam's eyes and forehead. After the OC spray was deployed, Gilliam complied with officers' commands to put his hands behind his back. He was then secured in handcuffs and placed in the rear of Officer Garza's marked patrol car.

(ECF No. 35-2, pp. 1–4, original boldface.)

E. Defendant Officer Miranda Hudson

In her affidavit submitted in support of the motion for summary judgment, Officer Miranda Hudson testifies as follows:

> My name is Miranda Hudson, a defendant in this case. I have personal knowledge of all of the facts stated in this declaration, and all such facts are true and correct.
>
> I am a patrol officer for the City of Deer Park. On November 23, 2023, at approximately 1523 [3:23 p.m.], I responded to a dispatch to provide backup support at 302 E. Lambuth Ln., where Officer Williams was already on scene and had advised that the male he had contacted was not cooperating. Upon arrival, I observed a shirtless and barefoot white male on the south side of the roadway between the sidewalk and parking lot of the school. I recognized the subject to be J. Paul Gilliam by name, appearance, and from previous

> encounters with law enforcement. I was already familiar with Gilliam from other encounters I previously had with him in my capacity as a police officer, as well as from the reputation he had among other officers in the Department who knew of his arrest record and/or who had personally participated in some of those arrests. I knew that Gilliam, by reputation, was a drug addict and had been arrested on several occasions in possession of illegal substances such as crack cocaine and synthetic marijuana. In addition to being shirtless and barefoot on a cold day, and perspiring heavily, Gilliam also had froth on his mouth, and was yelling incoherently and belligerently at the officers already on scene. The behavior, coupled with his reputation, caused me to believe that Gilliam was intoxicated. I also knew from his reputation that Gilliam could become violent and pose a risk of harm to other persons or to himself. I therefore believed Gilliam had committed the offense of public intoxication.
>
> When I arrived at the scene, I also observed that Gilliam was holding onto a medium-sized dog that was barking aggressively, preventing the officers from approaching him. I could see Gilliam becoming more agitated and threatening. At this time, Gilliam's father arrived on scene to take custody of the dog. Gilliam's father opened the front passenger door so Gilliam could place the dog into the vehicle. Gilliam walked towards the door and then jumped into the front passenger seat. I observed Gilliam grab the door in an attempt to close it. Officers Williams and Erickson grabbed onto Gilliam's arms and pulled him out of the vehicle. Officer Erickson then performed a leg sweep on Gilliam to take him to the ground. Once on the ground, Gilliam began to kick towards Officers Williams and Erickson. I assisted with pinning Gilliam's legs down. Along with Officer Erickson, I also had Gilliam's right arm. I attempted to bring it to his back to place him into handcuffs. He was actively resisting, pulling his arms away. Gilliam refused to allow Officers [*sic*] to restrain him in handcuffs after multiple verbal commands to show us his hands. He instead was attempting to pull both of his arms away from his back towards his sides. After warning, Officer Williams deployed OC spray to Gilliam's face with one short burst. Gilliam then complied with commands and officers were able to place handcuffs on him.

(ECF No. 35-4, pp. 1–2.)

## V. PLAINTIFF'S RESPONSE IN OPPOSITION

In opposing summary judgment, Plaintiff argues in relevant part as follows, *verbatim*:

Plaintiff Gilliam has never once been arrested for controlled substance by Deer Park Police. And the last guilty plea on a public intoxication charge was over seven years ago[4]

The officer defendants in this case were all well aware of Gilliam's reputation for drug abuse and threats of violence.

Officers make it sound as if I'm arrested weekly or monthly for public intoxication and am known to be violent when intoxicated.

This whole testimony of police where all defendants state the same apparent state of Plaintiff is excited delirium and his profuse sweating and incoherent yelling at officers with rapid slurred speech is just not apparent in my Facebook live post (Plaintiff's EXHIBIT. B-4) Facebook post, just one minute prior to officers arrival and several other post as well before that show up close, real time video of Plaintiff Gilliam's face and speech and there is nothing even remotely resembling the defendants claims sweating profusely and slurred rapid and incoherent speech and yelling at officers and threatening officers, these statement from officers are just not found in any video evidence in have been given.

What is clearly evident and audible on Delamorena's dashcam footage audio at (timestamp 2:22-2:23) Gilliam repeated statement of "I can't breathe I can't breathe" can be heard and then approximately 15 to 20 seconds after this notice of inability to breathe nothing changed except the introduction of

---

[4]Public online criminal records for the Harris County District Clerk's Office show that at least twenty criminal charges from various authorities including Deer Park police officers were filed against Plaintiff from 1993 to 2025. Two of the charges were filed against him in 2014 under the name Paul J. Gilliam. Thirteen of the charges resulted in convictions and seven were dismissed. All thirteen of his convictions occurred prior to the incident made the basis of this lawsuit. Defendants submitted Deer Park Police Department records showing that Plaintiff was twice arrested by Deer Park police officers in 2017 for public intoxication and possession of a controlled substance; in 2019 for an Emergency Detention Order and transport to a hospital following his threats to shoot himself and the neighbors; in 2019 for shoplifting and possession of marijuana; in 2019 while under the influence during execution of an arrest warrant; in 2015 for possession of synthetic marijuana and a crack pipe with cocaine residue and driving with a suspended license; twice in 2018 for public intoxication and possession of marijuana; in 2021 for destruction and/or vandalism of a motor vehicle; in 2021 for possession of marijuana following execution of an arrest warrant; and in 2021 for investigation of counterfeit currency. (ECF No. 35-6, pp. 6–8, 10–12, 20–25, 42–46, 51–52, 55–59, 70–73, 77–79, 82–84, 92–93, 99–100.)

chemical deterrent oc spray at point blank distance of one inch and the claim from all defendants in their declarations for summary judgment motion of one second burst of oc spray to plaintiff Gilliam and this is contradicted by Delamorena's dashcam and Sgt Travis Trotti Dashcam which show on Sgt Trotti's Dashcam when he arrives Gilliam is shown incapacitated by police incapacitated of even breathing and you see Williams at (timestamp 1:58) shaking up his oc spray and then the blast you see him put his hand with the can directly into plaintiff Gilliam's face and chase it back and forth left to right until (timestamp 2:09)

On Delamorena's dashcam you can hear the blast and several distinct sounds of oc spray deployment so much officer Garza was overcome and coughing as Trotti walks up Garza is coughing and walking away at the (timestamp 2:31–2:40) you can hear multiple blast of oc spray being used as I scream Morehead[5] hold my head to rub it in as you can clearly see and then continue to hold me down prone unable to breathe and during this my rotary cuff and labral were torn and mri results show the injury and procedure that had to be performed was painful shot in should blade in back.

Defendants upon arrival at 302 e. Lambuth ln. State that they identified suspect upon arrival as J. Paul Gilliam and in police reports from that day officers Williams and Spencer stated they didn't identify suspect until he stopped walking northeast of the parking lot Which was after the show of authority and blocking my path home by Garza and his drawing of his taser sated in officer Garza's initial police report.

Physical low, which governs the southern district of texas, it is increasingly recognized that applying weight to a prone subdue suspect back can constitute deadly force. The 2021 rolling in temper versus Diller. The fifth circuit clarified that prolonged prone restraint after a suspect is incapacitated, is a constitutional violation.

Illinois v. Wardlow a person commits an offense if he has ignored officers, orders to stop or come back when officer has reasonable articulable suspicion, a crime was a foot. Defendants use case where plaintiff was wrongfully arrested. Gilliam v. Kuchinski, case #424-cv-01824 The charge of public intoxication was dismissed in this case. Due to lack of evidence of guilt.

---

[5]The Court finds no other reference to "Morehead" in any of the parties' pleadings.

The federal complaint was dismissed from defendant officers filing motion for summary judgement and the fraud that the supporting evidence with that motion contained with no clear complaint witness stated as proof of the accusations made from a unknown and a claim of an attempted counterfeit money transfer at a sonic drive thru and the dashcam footage was a complete deepfake and not a true account of the interaction yet, caused for Dismissal with prejudice in the case and motion 60(b)(3) fraud on court and reconsideration of prior judgement due to the fraudulent actions and lack of RAS for the detainment period.

Brown vs Texas: officers cannot stop and seize someone without specific objective facts indicating criminal activity.

The Deer Park police blocked plaintiff Gilliam's path from the start of initial contact without these facts.

'This makes the initial seizure unconstitutional under the fourth amendment.'

Graham versus Connor: under this standard, the courts evaluate three main tests to determine reasonableness and police not having any offense failed the first one.

Severity of the crime: There was no crime and no crime reported and if there was a noise disturbance this day that truly offended anyone it was just a brief outburst while posting a live post to Facebook. Then the disturbance.

United States versus Flowers 2021: When officer objectives manifest an intent to restrain liberty through a show of authority before any RAS reasonable articulable suspicion is obtained, when officers perform this maneuver without RAS, this seizure is unlawful and unconstitutional.

Garza and Williams suvs dashcameras do not show this action but Elementary School Surveillance footage clearly shows that Plaintiff was wrongfully arrested without any reasonable articulable suspicion when police blocked path. (School footage Lambuth east parking camera 01) clearly shows police block path.

Attached to this opposition to defendants motion for summary judgment is:[6]

1. Plaintiffs MRIscan report and procedures performed due to the tearing of rotator cuff and labral.

2. Plaintiffs SanDisk of his witness list and exhibits.

3. Facebook post live and elementary school footage of before and during the interaction with police

4. Sworn declaration of plaintiff under penalty of perjury.

5. Defendants police internal investigations reports all of which have no relevance and character evidence rule 404(b) should exclude all of defendant's internal investigation reports[7]

6. Documents 35-6 page 2-102. Out of these reports 8 of the 12 reports are not even convictions and the once PACS case isn't even my name but a Robert Paul Talley who was the one who had controlled substance cocaine in pipe. Incident #15-01829 4-25-2015 pgs. 55-102

[Plaintiff then references eight criminal cases that were dismissed in 2018–2023.]

(ECF No. 42, pp. 1–4; original spelling, grammar, punctuation, capitalizations.)

## VI. ANALYSIS

[6]No exhibits or other attachments were received with Plaintiff's opposition to the motion for summary judgment. The Court received Plaintiff's SanDisk flash drive device (ECF No. 43) but it did not contain any retrievable information. To the extent Plaintiff argues that his Facebook video recordings, the police dashcam video recordings, and the Dabbs Elementary School security camera video recordings support his position, the Court has reviewed these same video recordings as submitted by Defendants.

[7]Plaintiff objects to Defendants' police record exhibits (ECF No. 35-6) as having no relevance and inadmissible under "evidence rule 404(b)." However, in his very next paragraph, Plaintiff relies on the same evidence in support of his opposition to summary judgment. Consequently, the Court finds that Plaintiff has waived his objections to the exhibits.

Plaintiff sues Defendants in their individual capacities for false arrest and use of excessive force as to the events of November 23, 2023. Plaintiff makes no specific allegations against the officers on an individual basis and instead brings the claims against the Defendants as a group. Defendants move for summary judgment dismissal of Plaintiff's claims on grounds of qualified immunity.

A. False Arrest and Qualified Immunity

The probative summary judgment evidence shows that Defendants responded to a citizen's call to the Deer Park Police Department reporting that a white, reportedly bare-chested, male was screaming at the top of his lungs at no one at the Dabbs Elementary School. Defendants arrived at the location and found Plaintiff, shirtless on a chilly Thanksgiving Day, on the school grounds with his unleashed dog. Defendants recognized Plaintiff from prior arrests and knew him to be a drug addict with a reputation for belligerence and potential violence when intoxicated. Their intent was to detain Plaintiff to determine whether he was intoxicated, or whether his loud, incoherent screaming was due to some mental health emergency, or to order him to cease his disorderly conduct.

Plaintiff walked away from the officers, ignoring their orders to stop, and loudly yelled at them to stay away. They observed that Plaintiff had slurred, rapid, and incoherent speech, dilated pupils, was shirtless and sweating profusely in the chilly weather, and had

white foam around the corner of his mouth. Defendants also noted that Plaintiff emitted a chemical odor known to be synthetic marijuana. Given these signs and in light of Plaintiff's reputation for addictive stimulant abuse, Defendants formed a professional opinion that Plaintiff was exhibiting excited delirium from stimulant use and was likely intoxicated. Believing Plaintiff was a possible danger to himself or others, the officers determined there was probable cause to arrest Plaintiff for public intoxication.

Plaintiff pointedly disagrees, and contends that his Facebook video recordings refute Defendants' affidavits. According to Plaintiff, his Facebook video recordings – which he made one or two minutes before the officers arrived – clearly show that "there is nothing even remotely resembling the defendants claims sweating profusely and slurred rapid and incoherent speech and yelling at officers and threatening officers, these statement from officers are just not found in any video evidence in have been given." (ECF No. 42, p. 1, *verbatim*.)

"[W]here there is video capturing the events in question and opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Valencia*, 836 F. App'x at 296 (cleaned up); *Garza*, 943 F.3d at 744 (rejecting plaintiff's version of facts as "blatantly contradicted and utterly discredited by video recordings").

The Court has carefully reviewed Plaintiff's Facebook video recordings as submitted by Defendants and finds that they show beyond dispute that Plaintiff was shirtless and sweating, had white foam in the corner of his mouth, was yelling and screaming loudly and incoherently with slurred, rapid, and often unintelligible language, and had made repeated threats. Plaintiff's self-recordings exhibited unsettling behavior, demeanor, and language. Moreover, the school security camera video recordings show additional behavior and actions by Plaintiff that support Defendants' finding of probable cause to arrest him on suspicion of public intoxication. The recordings show Plaintiff wandering around the elementary school campus, shirtless, agitated, crouching and bobbing up and down, throwing punches and gesticulating wildly, yelling at his cell phone, tripping over a parking lot curb, making repetitive obscene gestures at the school building and security cameras, and dragging his dog by the harness. The various patrol car dashcam videos show Plaintiff walking away from the officers, yelling at them in a loud, hostile, and threatening voice.

Plaintiff presents no probative summary judgment evidence that raises a genuine issue of material fact controverting Defendants' finding of probable cause to arrest Plaintiff on suspicion of public intoxication. Nor does he raise a genuine issue of material fact or cite any applicable case law that would deprive Defendants of entitlement to qualified immunity as to his claim for false arrest.

Defendants are entitled to the defense of qualified immunity, and Plaintiff's claims against them in their individual capacities for false arrest are **DISMISSED WITH PREJUDICE**.

B. Excessive Force and Qualified Immunity

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on the facts and circumstances of each particular case." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (cleaned up). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. The inquiry in excessive force cases is objective, not subjective. *Id*. at 397. And the "inquiry into the reasonableness of police force requires analyzing the totality of the circumstances." *Barnes v. Felix*, 605 U.S. 73, 80–82 (2025). Factors to consider include (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest." *Graham*, 490 U.S. at 396.

The probative summary judgment shows that Defendants determined there was probable cause for arresting Plaintiff on suspicion of public intoxication. Plaintiff's father,

who lived only a few houses away from the elementary school campus, was called to pick up Plaintiff's dog. The officers told Plaintiff he was not allowed to leave because he was being detained for investigation into his apparent state of intoxication. While waiting for his father's arrival, Plaintiff resumed yelling at the officers, telling them, "You're not taking me to jail," "I'll kick your ass so goddamn fast," and threatening that if they touched him they were going to die. The patrol car dashcam and school security camera video recordings all show that no officer had physical contact with Plaintiff at any point before his father arrived at the scene to take the dog home.

All of that changed in an instant when Plaintiff approached his father's truck to place the dog inside, then jumped inside the truck himself and tried to close the door behind him. Despite having been told by Defendants that he was not free to leave, Plaintiff attempted to escape from the officers and evade arrest. He ignored their orders to get out of the truck, and the officers physically pulled him from the vehicle. He resisted their efforts and attempted to pull away from them, at which point he was taken to the ground. He continued resisting the officers' efforts to place handcuffs on him. Officer Williams deployed pepper spray to bring Plaintiff under control, and Plaintiff stopped fighting the officers and began saying, "OK OK OK." He was then handcuffed without further incident and placed in the backseat of a patrol car for transport to jail.

Plaintiff alleges that excessive force was used because multiple pepper sprays were deployed and the officers continued to apply force after he was incapacitated. The Court has

carefully reviewed the video recordings and has detected only one use of pepper spray, as noted by Defendants. Nor do the recordings show that Plaintiff was incapacitated at any time; to the contrary, he continued resisting the officers and yelling at them until he was handcuffed and the officers helped him to his feet. Moreover, Plaintiff contends that he yelled "I can't breathe" several times but that the officers continued to use force against him. However, the video recordings show that Plaintiff made no breathing complaints until after the use of the pepper spray. The recordings also show that he was able to breathe and continued yelling throughout the incident. He made one further breathing complaint after being placed in the patrol car; however, the officers rolled down the backseat window next to him and he made no further breathing complaints.

The first *Graham* factor – the severity of the crime at issue – weighs in favor of Plaintiff as to the suspected public intoxication but in favor of Defendants as to his evading and resisting arrest. The second factor – whether Plaintiff posed an immediate threat to the safety of the officers or others – weighs strongly in favor of Defendants. Defendants and Officer Garza testify in their affidavits that Plaintiff was a known drug addict who had a tendency to become belligerent and violent when intoxicated. Plaintiff plainly and clearly threatened the officers and repeatedly yelled at them in one or more of the video recordings. The dashcam and school security camera video recordings show that the officers had no physical contact with Plaintiff prior to his attempted escape and had not checked Plaintiff for weapons. The officers were also in the presence of Plaintiff's dog, who was barking loudly

and aggressively at them. The officers indicated to Plaintiff multiple times that he needed to control his dog. The third *Graham* factor – whether Plaintiff was actively resisting arrest – weighs very strongly in favor of Defendants. Plaintiff, directly disobeying the officers' orders to stay where he was, jumped into his father's truck and tried to close the door. When they pulled him back out of the vehicle, he became belligerent and threatening, and had to be brought to the ground. Plaintiff then resisted their efforts to handcuff him, and can be seen in the dashcam video recordings kicking out with his legs. Not until Officer Williams deployed pepper spray did Plaintiff finally stop resisting and submit to handcuffs. Thus, under the totality of the circumstances, Defendants' use of force was not objectively unreasonable and no constitutional violation is shown.[8]

Plaintiff presents no probative summary judgment evidence that raises a genuine issue of material fact as to Defendants' entitlement to the defense of qualified immunity. Nor does he cite any applicable case law that would deprive them of qualified immunity as to his claim for use of excessive force.

Defendants are entitled to the defense of qualified immunity, and Plaintiff's claims against them in their individual capacities for use of excessive force are **DISMISSED WITH PREJUDICE**.

## VII. CONCLUSION

[8]The video recordings refute Plaintiff's allegations that Defendants "stomped" him into the ground and "tore" his arms apart.

For the above reasons, the Defendants' motion for summary judgment (ECF No. 35) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**. Any and all other pending motions are **DISMISSED AS MOOT**.

Signed at Houston, Texas, on this the 30th day of September, 2026.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE